Case number 16-1447. Raising Enthusiasts and Suppliers Coalition petitioner versus Environmental Protection Agency and Michael S. Reagan. Ms. Broome for the petitioner, Ms. Chen for the respondents. Ms. Broome, please proceed. Good morning, your honors, and may it please the court. My name is Shannon Broome, and I represent the petitioner in this case. I would like to reserve four minutes for rebuttal, please. Thank you. I will cover in my time two primary points. First, why this case is important not just to my client, but to people across the country. And second, why EPA's action here constitutes a breathtaking effort by the agency to substantially expand its authority with no basis in law and wholly unsupported by the record that the agency purport. It is arbitrary and capricious. And of course, I'll answer any questions that the court may have along the way. First, motor sports are part of the fabric of this country. We need to look no further than the Formula One race in Miami last weekend to see who participates. A quarter of a million people were there in person, millions watched on TV. And unlike football, the spectators of the sport also are participants. They are racers themselves. Can I ask, just kind of as a background question, what have racing enthusiasts been doing since 2016? Are they still buying all the parts that they used to buy? Are all those parts still being sold or are these races still going on? Right. Well, races are still going on all across the country, but EPA launched starting in 2016 after it issued its final rule. That's when it launched its enforcement initiative against the small businesses and other companies and some individuals, although we haven't found many cases at all. That's the district court case that you cite several times. Yes, and if that's one, there's an entire initiative. They have, you know, probably 50 cases going. So would I be right to say that companies that used to sell, used to make and sell parts are no longer doing that? They, yes. So there are several enforcement actions ongoing. I imagine some people are continuing. This doesn't matter. I'll drop it after this one last try. I'm not asking what is doing. I'm asking what manufacturers and sellers are doing. Has their behavior changed at all? Yes, it has. They have, many have stopped selling because of the threat of the EPA enforcement and the cases that they see. And many are subject to enforcement and EPA brought an injunction against Gearbox Z. And, you know, others are looking at that and they have stopped and been deprived of the ability to sell their product. What if a racer just changed one small part of the emission system? That's all it changed. And they said, now it's a race car. Would they have broken any laws? It depends on how they use it. Let's say they only use it on the racetrack. Then it is outside the ambit of the Clean Air Act. But on your view, the amended regulations? Under the amended regulations, right. So under EPA's statement in the preamble, EPA's view would be that that is illegal and that they are violating the law. I don't really care about preamble. So regulatory text, what text in the new regulations do you think makes it illegal to take a regular motor vehicle and adjust it into a race car? Right. So in 85.1703A, it's used to say that the indicia is that vehicle exhibits features which render its use on highway unsafe, impractical, or highly unlikely. Such features but not being limited to tracked road contact means, etc. And now EPA has changed that to say prevents the use on the highway. So that's one. So they have changed it so that it's no longer a use-based, you know, you have to prevent the use. And it also, back to your question on the impact, people would need to even, anyway, I think that I covered it earlier. On the safety modification, clarification, whatever label we want to give it, how are you injured by that from an Article 3 standing perspective? So my clients would now have to track and have increased compliance costs in order to track how the vehicles are being used and that they comply with the safety exemption. And that's a significant cost because the way that this industry is set up, it's a vertically integrated industry. So you have manufacturers, distributors, and retailers. And the distribution system is a complex electronic distribution system that is a centralized database that people subscribe to. And you have to, you know, the ability for someone on the manufacturer side to trace through that system to how a part is actually being used would impose substantial new compliance costs. Where in the record would I find that you've laid out those compliance costs so that I can find that you've demonstrated standing? And if it's easier to come back to it and rebuttal, if the presiding judge allows, that's fine by me. Mr. Pooley stated in his declaration that he did have increased compliance costs. So that is in Mr. Pooley's declaration. I think it's in paragraphs 11 or 6. And, you know, we'll be happy to supplement on that issue if the court would like that. EPA did not question that, so we didn't add any supplement to that. But we're certainly able to do that. Sorry, increased compliance costs or just reduced sales? No, it's in the... It's compliance costs and reduced sales, but increased compliance costs. They have to, under EPA's view of the world, you know, we have to... Well, we'll check it. But maybe I missed it. I thought it was about reduced... It's paragraph 10 on page 3. I apologize for misciting the paragraph. Frankly, except what you said about the regulation changing and the regulation to preventing use on the highway, I haven't seen anything in the record to support anything else you've said today, including the Pooley declaration. There's no... There are no... There's some... That's totally conclusory. We don't know anything about what people behave... From this about what people are doing or what the effect is on the... Your member here, I guess it is, Mr. Pooley. This seems to be... You seem to have assumed that somehow we would be, you know, just taking into account the world of automobile racing, about which, you know, I know nothing. Well, our brief included several references to information about the industry, and I guess you're making my point in many ways. I'm looking for some evidence that... About this situation, and I'm not finding anything. Maybe the allegations are broad, and they're not supported with any exhibits or anything that would give them... Flesh them out so that I know what's going on. The sales may be down, but it doesn't say why or what people do with them as a result, or what they do when they do buy these defeat parts, and what they're doing when they don't. It's entirely vacuous, and there's nothing other than the Pooley Declaration on which to rely. Or is there? So, Your Honor, the... I think it's... It is self-evident that if EPA says you can't sell parts and people have been selling them, that they will not be able to sell them anymore, and they will be injured by that. Somebody who can come in and say, that's what's happened, and was heard affected me, in some way that we can actually make sense of, rather than just saying, that's it, it's affected me. Well, I mean, we would be happy to provide a supplemental briefing on standing. Mr. Pooley can demonstrate that his sales are down. We could get other rest members to provide additional... We used to entertain supplemental papers on standing until 30 years ago, and Eric said, it's got to be in your first filing with the court, first substantive filing with the court. Well, it is in the first substantive filing, Your Honor, and I recall back in the E-15 case, I believe it's the Chicken Council case in, I want to say, 2013 or 2014, Your Honors, did have supplemental briefing on standing in a similar issue where the injury from the renewable fuel standard case. I'll have to see why we departed, if we did, from our practice in that case. But, I mean, I think that it is clear that Mr. Pooley has submitted an affidavit that says, and under penalty of perjury, that he has been injured in his sales and has experienced increased compliance costs, and increased compliance costs have traditionally been considered to establish standing, and so I'm not exactly sure what the court would want beyond those increased compliance costs. He has to track, EPA is saying that he has to track. I guess what we're lacking here is anything to do to tie this to the safety. Well, the SEMA comments that were on the record in the administrative rulemaking stated that there were adverse effects on the industry, and that is in the administrative record, and those comments are in the JA. I don't have it on that page. Your position is, on this point, it has to be that it is self-evident, which is one of the exceptions to the rule Judge Ginsburg is citing, it is self-evident that in order to convert a motor vehicle into a race car, you remove a bunch of safety features, and I don't know, maybe it is to racers, but I didn't know that when I started prepping. Also, if the rules change the baseline, then maybe you don't, and racing isn't quite as fast as it used to be. I'm sorry. Oh, I was going to ask Ms. Broome, but what you just described, would that be an injury if it prevented race car drivers from driving as fast as they want to? Why, as long as it affects everybody? Right, so there are things that you have to do in order to convert a car into a race car, and we do list those in our brief. Things like removing the seats, it's not just emissions, there are a number of indicia, but part of it is emissions because the emission controls reduce the power, and so it's not just removing them, but replacing them with the parts that make the vehicle function, and so in that case, those are the parts that are being sold. But the regulation challenging is all about safety features, so you sort of have to connect your interest as a seller of parts for race cars, motor vehicles that are modified to become race cars to this safety feature regulation, which is maybe not so obvious to me. I'm not sure, was that question to me? I wasn't able to hear it entirely. I wasn't, I didn't have a question. You didn't miss anything. Okay, but I guess I'm out of time, but I would like to. Let me ask one question. What's your response to the suggestion that the preamble doesn't do any work? I think the preamble states EPA's position, which was the first time EPA ever publicly stated that it is illegal to convert a motor vehicle into a race car, and they stated there, once a motor vehicle, always a motor vehicle view. Back in 1965, when the Cleaner Act was enacted, there was regulated and unregulated. Motor vehicles were regulated and everything else was unregulated. Fast forward, and EPA accepted that. The non-road engines, the tractors, the snowmobiles, and all that stuff were not regulated, and so were competition vehicles not regulated. That was how the world operated until 1990, when Congress decided to add non-road engines into the mix and regulate them. Non-roads are tractors and snowmobiles and other farm equipment and that type of thing. Congress said, well, we've got to make sure that it's clear that we're not bringing in competitive vehicles. I mean, that's a very odd thing for you to be challenging, because the preamble statements that you're focused on are associated with the agency's declining to adopt a proposed regulation that would have made it crystal clear that you can't convert a motor vehicle into a race car, and declining to do so because the agency says we're not anti-racing. I mean, that aspect of the rule doesn't hurt you. That's actually helpful to you. Right, that is helpful, but then they created kind of a sleight of hand there, and they also said, but this change isn't needed, because that's what it always was. Maybe, but that might be an argument. That sleight of hand aspect of this might be an argument why adopting the change to the definition of motor vehicle is arbitrary, but it's not an argument that you were harmed by the failure to adopt a proposed rule that would have hurt your clients. It's what they said. The final action that we have is the preamble, and there is a lot of case law that we cite, Whitman versus American Trucking, Appalachian Power, Prop Life versus EPA, that clearly establishes in the D.C. Circuit that the preamble statements, when definitive, constitute final agency action. I mean, even a guidance document can be a final agency action. That's not the Appalachian Power case. If there's any final agency action, it was the decision not to do anything. No, it was the, respectfully, your honor, no. It was the statement that it is now illegal to convert race cars, motor vehicles, into race cars, into competition vehicles. That is the final agency action, and we know it is, because now EPA said in the Gearbox Z briefing that it had effectuated that change, that it may have changed the law. It's bringing cases that it could well have brought before. It seems to me what you've outlined is that, for a long time, they decided not to enforce the regulations as they were, since 2011, and then they decided they would. If this was an exercise in enforcement discretion, we have numerous indicia in the brief that show that EPA had never taken that position before. We have the Congressional Research Service report. We have EPA's Green Racing Initiative. We have 50 years of conduct, since 1965, where they never did anything, and it was happening right in front of them. EPA was engaging with the racing community all along, and if they thought that that was illegal, they should have said something. If you look at what they cite in their brief... No, administration's enforcement policy changes, as long as it's consistent with what the law authorizes. This was not an administration change issue. It wasn't an administration policy change issue, because if you look at it, it started at the end of the Obama administration, and it continued in through the Trump administration. I don't think it's fair to say that's the case. I'm just saying, policies change. One reason is sometimes administration changes. Sometimes they simply reevaluate and change their position without a change of administration. Can I ask you one... That's not what happened. This was not a 50-year exercise in enforcement discretion. If it was, when EPA exercises enforcement discretion, they make a big deal about it. They blast it from the rooftops. You look at the COVID-19 situation. They issued an enforcement discretion policy, and they listed all the criteria that you had to meet. If EPA really thought this was an exercise in enforcement discretion, then they would have been talking about it right and left. Instead, what was happening is what the law was, which is competition vehicles were not regulated under the motor vehicle provisions, and the EPA never thought that they were. Can I ask you just briefly on the other regulation that you challenge, the competition exemption, how are you harmed by that one? There are two provisions in this manufacturers of motor vehicles, and your clients are not manufacturers. The other applies to people who make changes to non-road engines, which your clients may or may not do that, but the changes to that regulation are wholly cosmetic. What injury flows to your clients from these changes? Can you just help me? This is 40 CFR 1068, which has an A and a B, and A is the rule for manufacturers, and B is the rule for modifiers with wholly cosmetic. Point 235. Yes. Okay, thank you. On that one, what EPA did there is they said the following provisions apply for non-road engines and equipment, but not for motor vehicles or for stationary applications. They have taken the position, and you see what they said they were effectuated their change to make it illegal for motor vehicles. That is how EPA has interpreted that provision since that time. That is their position. Okay, look at A. It is addressed to people who produce non-road engines or equipment. Any of those in the petition? Excuse me, Your Honor. I have just the excerpted provision in front of me. My understanding is your declarant represents sellers in the aftermarkets, not motor vehicle manufacturers. Correct. That is our declarant. We also have members who are manufacturers of aftermarket parts. That is useful to add something from them. All right. Well, I can tell you, it seems to me that clause A does not seem to apply to at least to Mr. Pooley or his organization. Anything else? Judge Walker? Judge Ginsburg? No, thank you. Okay, thank you. We will give you a few minutes on rebuttal. Thank you. You will hear from the government on whenever you are ready, Ms. Chen. Thank you, Your Honor. Good morning, and may it please the court. Sue Chen for the United States. The Clean Air Act prohibits tampering with emissions controls on motor vehicles, even if they are used solely for competition. That follows from the statute's text and structure, through which Congress set up a program to regulate motor vehicle emissions. That program treats motor vehicles used solely for competition no differently than other motor vehicles, and Congress chose to stick to that approach, even as it exempted other kinds of vehicles from the prohibition against tampering with emissions. I'd like to start with the statute and then briefly address why there was no new interpretation in 2016, and finally respond to Petitioner's point about the impact of this case. Under the Clean Air Act, motor vehicles used solely for racing are still motor vehicles, and they're still subject to the tampering prohibition. The statutory motor vehicle definition has no exit ramp based on competition use, and that, of course, stands in sharp contrast to the non-road definition, where Congress did put in an exit ramp. But I want to be clear that the non-road definition does not apply to this case, because everybody agrees that the vehicle that we're starting out with is a certified motor vehicle, and the question is, is that vehicle still a motor vehicle when you use it solely for competition? The motor vehicle definition... Seems to me the statute is ambiguous. It's key to design, but it doesn't address any question of at the moment of manufacture or at any later point. Seems to me the statute could readily bear either meaning. So the design that matters in the statutory scheme is the automaker's design, because that's what determines whether what you have is a vehicle and is a motor vehicle, and that is regulated under the Clean Air Act. But for us to win, you don't need to hold that the design of a motor vehicle never changes, because the kind of competition use and conversion slash redesign that the coalition is talking about does not exempt you from the tampering prohibition. And let me just specifically address the redesign question. I think there are three big problems with it. The first is that I think it's significant that Congress did not expressly exempt competition conversions from the tampering prohibition, even as they exempted alternative fuel conversions, as we discussed in our brief. The second problem is that this redesign theory would lead to an outcome that even petitioner concedes is wrong. So the way I understand the design theory works is that you make all these modifications to your motor vehicle, you add the roll cages, you add competition cameras, and it becomes something other than a motor vehicle. And that it becomes, I guess, what they call a competition use only vehicle. And at that point, at some point, the changes are substantial enough to impose on the object and a new design. Well, let's just assume that that's true for the second. At that point, the theory is that you can tamper away with that vehicle's emissions controls, but you would also be able to drive that vehicle all over public roads. There's no use-based limitation to the redesign theory. And the problem there is that on page 12 of the opening brief, the coalition says that if you drive your race car on public roads, it's still illegal to tamper with them. So that's a big problem with that theory. The other problem is that I think it leads to this- Why wouldn't what you just said make it, I guess, legal to drive a Formula One race car that was manufactured as a race car and not compliant with emission systems? Why wouldn't what you just said make it legal to drive that on the road? Well, the Clean Air Act does not regulate driving. But if your theory is once a motor vehicle, always a motor vehicle, why doesn't it stand to reason that once a race car, always a race car? Because I think what your hypothetical presents is a fundamentally different concept. You're talking about the relationship between something that does not start out as a motor vehicle. Does that stay a non-motor vehicle? Does it become a motor vehicle? Is there an on-ramp into the motor vehicle world? But the issue here is once- I mean, everybody agrees that we're starting out with motor vehicles. And is there an exit ramp from the motor vehicle world? And that touches on a different set of considerations. I'm not sure we get into it, because you might win on standing. So if I could give you a hypothetical about standing, and then I'm going to ask you what you think of it. And then I'm going to ask you to do what I think a lot of attorneys always want to do when they get a hypothetical. I want you to tell me how my hypothetical is different from this case. But first, I want you to answer the hypothetical. Imagine EPA just went on its website. And on Monday, it's- and none of this stuff had happened in 2015-16, this rule, okay? None of it's happened. And on a Monday, it says the Clean Air Act prohibits converting motor vehicle to a race car when you tamper with the emission systems. And then they get some angry calls. And so on Tuesday, they take that down. And they say, what we posted Monday, we took down. It was not intended to represent a change in the law or in policies or practices. Then they say, period. It wasn't necessary to post it on Monday, because it's always been illegal to do it under the statute. It's all on the website. And then the racing enthusiasts come and they bring an APA claim. And they say, not only are you wrong on the merits, but, you know, this was- this needed to go through notice and comment. Would they have standing to bring that APA claim? If they can show that during- They say, you have now put us through your Tuesday statement, where you said we never needed to post what we posted on Monday, because it's always been illegal. You've now put us to a dilemma. Comply or risk prosecution. And that's enough injury for us to bring this APA claim to what we'll call an interpretive rule that didn't go through notice and comment. Do they have standing there? If they can provide specific evidence that they're somehow injured by this, but even if they did have standing- They say they file a declaration, maybe unlike this case, okay? I mean, I'm not saying that this is a winner case, but unlike this case, they file a declaration. They say, we used to be doing this all the time. And after what you said on Tuesday, well, starting Wednesday, we stopped. And we don't want to stop. You've put us to a dilemma. You've put us to the choice of either comply or risk prosecution. And that constitutes final agency action. That's enough for standing. And we get to challenge the merits. And we get to bring our notice and comment claim. So they may have standing in that case, but I don't know if the Tuesday action is going to be a final agency action. So what's the difference? So you said they may have standing there. What's the difference between that and this? What are the substantive differences? What are the differences that matter? Well, there are two main differences. The first is we are not challenging their general standing to sue on the 2016 clarifications. We are just making a very limited standing challenge on their ability to challenge the adequacy of the explanation there. The second problem is that the premise of your question is just not true here because EPA has competition are not exempt from the tampering prohibition. And a footnote seven of our brief is examples that goes back decades. And in the regulations before 2016, EPA also made clear that the competition exemption applies only to the non-road world. And I think the thing to remember here is that the default rule is the tampering prohibition. You cannot tamper with emissions control. And if you want to get out of that prohibition, you need an exemption. And the only competition exemption around was the one for non-road vehicles. And in 2011, EPA amended the competition exemption at 1068-235 subsection B to add the word non-road. And so neither the competition exemption nor any other regulation ever offered an exemption to motor vehicles that were used solely for racing. And without an exemption, those vehicles are subject to the tampering prohibition. And that was true before 2016 and it was true after. So that's why I say the premise of your hypothetical is wrong. And that's a big difference with this case. In the real world, in this case, the announcement that we're not going forward with the regulation because the law has always been thus was also, I guess, we're told accompanied by a new enforcement initiative that had never been taken before. That's not true. In our brief, in the background section of our brief, we've cited examples of enforcement actions that predate the 2016 rule. So EPA has this. Are they in the period between 2011 and 2016? I think there was one example before 2011, but the point is they're not challenging the 2011 regulations. And EPA has focused on going after these defeat device manufacturers and distributors for years. It was not, it did not just, it's not like it snapped its fingers in 2016 and said, oh, we're going to go after them now. And if you look at the exact, so in, but no seminar brief, we also give an example of EPA's presentation at one of the major aftermarket trade shows where EPA got up in front of all with motor vehicles and planes are racing only do not shield you from the tampering prohibition. You have another regulation which allows motor vehicles to be redesigned into non-road vehicles. How is that possible? Why is it permissible to do that, but to go from motor vehicles to non-road vehicles, if you can never go from motor vehicles to race cars? I'm sorry, which regulation are you referring to? It is 40 CFR 1039.8012, says an engine originally manufactured as a motor vehicle engine or a stationary engine that is later used or intended to be used in a piece of non-road equipment is no longer a motor vehicle or stationary engine and becomes a new non-road engine. So if you're talking about non-road engines, it is not the case that once a motor vehicle, always a motor vehicle. I, well, I'm not familiar with that provision, but I would, what I would say is, I mean, yes, that is talking about engines and it's the new engine, the engine would, I guess, be regulated as a new, as something else, but we're not, again, we don't need you to hold that the design of a motor vehicle never changes. What we're talking about here is the kind of competition conversions that the coalition wants to do don't get you out of the tampering prohibition. And I just want to go back to the point about redesign, which I think they seem to be focusing on instead of the competition use. And the other problem with the design, the redesign is that it leads to this absurd outcome where the order in which you make changes really matters. So under their theory, if you first, you know, add the roll cages, add the competition camera, and then you remove the catalytic converter, that's okay. But if you flip the order and remove the catalytic converter first, and then add the competition camera, the roll cages, that's still illegal tampering. And that just can't be right. I mean, Congress was not putting form over substance when it was regulating tampering. Unless the court has any more questions. Just as a factual question, could you turn a motor vehicle into a non-road vehicle without tampering? I don't know. I don't know because, I mean, non-road vehicles are so different from work. So I don't know. But again, the coalition is not talking about changing their motor vehicles into non-road vehicles. Because non-road vehicles... I understand that, but it does, this probably just goes to standing. There are things in your regulations which tend to at least suggest that before these amendments, the kind of conversion that we're talking about was permissible, at least under the regulations. Well, I do want to clear that there are some regulations that talk about rebuilding engines. And so that's meant to basically allow you to leave your emissions controls in. Just one question on the merits, if we get there. So your position before us is that this kind of conversion is unlawful. But when you adopted these amendments, you declined to adopt a regulation that would have made crystal clear that you can't tamper, you can't change a motor vehicle into a race car. You declined to adopt that. And you said the reason you're not adopting that is that EPA supports racing. So, I mean, that's a very clear statement in a very clear proposal that would have made this unlawful. And now you've sort of, you know, through this elliptical interpretation of another reg that's about safety, you're saying, well, we did it anyway. We did it through changing the definition of a motor vehicle. And we have to jump through a lot of hoops to get to the merits. But if we get to the merits, that would seem to be a pretty good indicia that your explanation is lacking here. So, a few points. The first is, you're right, EPA did not finalize the longer statement. Because people, I think, were confused. And so EPA just- Because EPA supports motorsports. Its focus is not, nor has it ever been, on vehicles built or used exclusively for racing. That is true as a matter of its enforcement discretion on what to focus on in terms of building. But, well, let me just also say, to be clear, EPA does not regulate and has never regulated professional race cars like Formula One, like NASCAR cars. That has never been under the law. So, if you want to use your motor vehicle for racing, that's fine. Because Clean Air Act does not prohibit racing. What you cannot do is tamper with it. Now, I think as a matter of enforcement discretion, the agency does not focus on individual car owners who want to race. It enforcement efforts on the feed device manufacturers and distributors. So, is it fair to say, then, that in the past, racing was conducted by using automobiles that were stock cars when bought and had been modified through tampering, and racing going forward will be changed in that they will be unmodified? So, it's true that in the professional racing circuits, many, many decades ago, started out as production cars. But, for a long time now, if you look at NASCAR, you'll see that those are specifically built for racing, not just for racing, but for specific circuits rules. There and those cars are nothing like the vehicles you see on on streets. I mean, you know, not manufactured by the same companies that manufacture the street vehicles. They are sometimes, yes, they are manufactured by the same companies, but they use completely different designs. So, for example, I think the latest NASCAR series have Toyota Camry. They're the Cup Series Camrys, and they're designed differently. They don't have doors, for example, because doors are apparently a big liability in high-speed crashes, and so that's why you see NASCAR drivers getting in and out through the window. Well, that's not going to work in your street car, because you're using your cars to transport people and things on public roads, and you need doors. So, that's one example of how very different these professional race cars are from the cars that you and I drive on the streets. So, those cars, when they are first built, are certified motor vehicles or not? Which cars? The ones you're describing with, let's say, no doors. Those are not certified at all. They're not regulated by the Act, because they're not designed for transport on public roads. Those have been used until now, until before the change in enforcement policy, and they will continue to be used. Is that correct? NASCAR cars will continue, I mean, I guess, unless Congress amends the Clean Air Act. NASCAR cars have never been regulated under the Clean Air Act. So, what is it? What set of vehicles is it that are experiencing a change in enforcement policy? I don't think there is a change in enforcement policy. EPA has been looking. So, what is the nature of the cars that you're concerned about, if it's not the ones that were built for and are used for racing? There's another set, apparently, of things that were more like stock cars and then were adapted, or is it the ones that were built for racing and were changed? I see. Okay, let me just explain what we're actually disputing here. We're not disputing the NASCAR cars and the Formula One cars, because those are out of the Clean Air Act. Formula One cars, I've seen, they don't even look like cars. Exactly. They couldn't go on the road. They go, I don't know, a few hundred meters or something. Well, there are probably state laws about what kind of cars you can actually drive on the road. Under the Clean Air Act, they're not regulated. Formula One cars, NASCAR cars, not certified. They don't have to have emissions control, period. Now, what we're talking about is a certain, a very small group of things called motor vehicles, right? Those are things that you generally see on streets, that they're your passenger cars, your pickup trucks, that sort of thing. And everybody here agrees that, as a general matter, it's illegal to tamper with motor vehicles, vast majority of which don't race at all and are probably subject to the tampering prohibition. The coalition also agrees that a motor vehicle is not exempt from the tampering prohibition just because it competes in races. If they go on public roads at all, it's illegal to tamper with them. So the only kind of vehicles that the coalition says it cares about are motor vehicles, so like your Camrys and Accords and whatnot, that are used solely in competition and that never drive on public roads. Now, there's just no indication. And these are cars that were designed, as you were describing, never to go on public roads? No, these start out as motor vehicles. They're like the passenger cars you buy from your dealer that you use for commuting, for picking up the kids. And on page 11 of the opening brief, the coalition makes clear that that's the kind of cars we're starting with, and that's the kind of car they want to convert into race cars or use solely for racing. And we're saying, no, those cars, those kind of use, the kind of conversion they want to do, does not exempt that motor vehicle from the tampering prohibition. So Ms. Broom started off telling us about a recent race in Florida. Which kind of cars would have been involved? Those are Formula One cars. They are professional race cars that are never regulated by the Clean Air Act. And totally unaffected by the discussion we're having? Correct. What's your policy concern? If you're willing to allow Formula One cars that presumably spew massive amounts of gasoline into the air, why would you care if someone takes an ordinary car and turns it into something a little bit more like that? Is it that that vehicle can then be used on the roads after the race? Yes. Well, that is one concern, yes. Because, I mean, frankly, you can convert, you can race your passenger car and make some conversion, say I'm racing, but there's nothing to stop you from taking it onto public roads again. And I think, so there, I think there are two issues here. One is that just, if you consider the statute's structure, there's really a pretty specific mechanism by which Congress, that Congress used to regulate you have the burden that's put on the automaker to meet the emission standards. They have to install emissions controls and show that those controls work. And then on the back end, Title II safeguards, those, the automakers upfront work by telling everyone they can't tamper with those controls. And so this back end protection is really crucial to the regulation of it's not just our policy, it's Congress's decision. I mean, Congress has had multiple opportunities to regulate motor vehicles differently from non-road vehicles to shield motor vehicles that are used solely for racing from the competition exempt from, excuse me, from the tampering prohibition. And it never did that. And so we have to, we have to follow Congress's policy on this. Let me, I'm, I was intrigued by Judge Katz's question a few minutes ago, the statement that the EPA supports amateur racers. If you view them as lawbreakers, polluting the environment and defying the will of Congress, why do you support them? We support racing. We do not support tampering. Would it have been more accurate to say the EPA supports amateur auto racers who race in a way that currently no amateur auto racers race? I don't think that's true that currently no auto, no auto racers race without tampering. Um, I think there, there are races that set rules about what you, what kind of emissions controls you have. I mean, but I think the bottom line is EPA supports racing. That's what it was trying to say in that statement. Um, but we're, and, and I think, you know, our rule, I think as Judge Ginsburg points out, it doesn't disadvantage, um, race car drivers as to each other. It doesn't tell some people you can't tamper with your, with your motor vehicles and others. It does tell people who want to drive really fast that they can't drive as fast as they want. I mean, the whole point of racing is to, is to drive as fast as is to drive fast, right? I mean, they could have chosen, they could have chosen to play like dice if all they cared about was competition. Well, even NASCAR has a lot of rules about what you can do to your cars. And there are safety rules for those cars as well. So it's not true that, you know, the only thing that everybody cares about is to drive as fast as possible. No, but I mean, this statement was made in the context of explaining rejection of a rule that would have clearly resolved this precise question about tampering. Well, I think, you know, there are, there are comments where people were confused about that rule and EPA said, all right, let's just, we don't need this rule. Let's not make things worse. And EPA wanted to clarify that for people who thought that it was cracking down against racing as such, or, you know, professional racing that no, it was not doing that. Okay. Thank you, Ms. Chen. Thank you. Ms. Broom, we'll give you two minutes. Thank you, Your Honor. So I do want to just briefly touch back on standing and refer the court to Grocery Manufacturers Association versus EPA. And in that case, the court said that standing, we're standing as self-evident that we do not need to do that. If you look at Mr. Pooley's declaration and you look at 1068.235, which is redlined at page 29 of our opening brief, they say, but not for motor vehicles. And that is Mr. Pooley's business. And he was harmed by that addition to the regulations. I would also know, yes. I said earlier that the court accepted or requested supplemental information about standing. Pardon me? You say earlier that the court received accepted supplemental. I'm sorry, that was in the chicken council case. And I can get you the site on that. I think that was also in grocery manufacturers, but I can get you that information, Your Honor. I think we can find it. Okay. With respect to Ms. Chen's statements about the 2011 rule, in 2011, EPA part 1068 only addressed, had only addressed non-road vehicles. So that explains why that change was made then. And it was not addressing converting motor vehicles into race cars. So that's a red herring. I would also say that this is not a case about tampering. It's about the definitions. And so, and her view that an EPA's view that it's NASCAR and Formula One, and that's it. It's an elitist view of the world. The vast majority of racers in this country are working on their stock cars. And if you think about what Congress said, which I'm so glad that Ms. Chen raised, back in 1965, NASCAR was production vehicles, as Your Honor's pointed out. And so, it makes no sense to say that Congress prohibited this in 1965 in the face of they are arguing with reality. And so, substantively, I respectfully submit that what they have done is inconsistent with what Congress intended and what Congress said. On the statutory question, I was kind of focused on the word design and thinking, just as a conceptual matter, it's perfectly plausible to imagine a redesign. But what's your response to EPA's point about the tampering rules? And that the tampering rules prevent, by their terms, exactly what it is you would have to do in order to effectuate a redesign. It's not so much that conceptually you can't redesign a motor vehicle into a race car, it's just that you can't do that under the tampering rules. I mean, I think those are issues that EPA could have discussed if it was having a non-arbitrary and non-capricious rulemaking. There's none of that. That's just what the statute does and has always done. In the record, exactly. And also, the fact is, once you decide to make it a race car, then you can't drive it on the street anymore. And there are objective indicia of that. And so, there are things that EPA could bring in an enforcement case, but what it wants to do is not to have to prove any of that in the enforcement case. And instead, just say that if I offer for sale a part that could be used on a vehicle that has a certification, then that is, that puts me in the position of effectively a distributor of illegal parts and that's it. Thank you very much. The case is submitted.
judges: Katsas, Walker, Ginsburg